THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. VERNON WATSON, Defendant-Appellee

First District (6th Division)   No. 1—91—1351

Opinion filed January 28, 1994.—Rehearing denied March 9, 1994.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Scott Nelson, and Michael D. Latz, Assistant State's Attorneys, of counsel), for the People.

Rita A. Fry, Public Defender, of Chicago (Allan R. Sincox and Stephen L. Richards, Assistant Public Defenders, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Pursuant to Illinois Supreme Court Rule 604(a)(1) (134 Ill. 2d R. 604(a)(1)), the State appeals from an order of the trial court ruling inadmissible scientific evidence offered against defendant, Vernon Watson, who was charged with aggravated criminal sexual assault, armed robbery, and aggravated kidnapping. Prior to trial, defendant filed a motion *in limine* seeking to exclude the results of a DNA profiling analysis performed by the Federal Bureau of Investigation (FBI) which indicated that defendant's DNA matched that of the assailant. The trial court conducted an extensive *Frye* hearing (*Frye v. United States* (D.C. Cir. 1923), 293 F. 1013) to determine whether the evidence would be admissible at trial. The *Frye* court held that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific

community. The trial court here ultimately ruled that, while the methodology used in declaring a DNA match was generally accepted within the relevant scientific community, satisfying the requirements set forth in *Frye*, the procedures employed in calculating the statistical probability of a random match were not generally accepted in the relevant scientific community. On this basis, the trial judge granted defendant's motion to exclude the results of the DNA profiling analysis at trial. The State has appealed.

Defendant was charged with the aggravated criminal sexual assault, armed robbery, and aggravated kidnapping of C.A., a 24-year-old woman who was attacked on May 25, 1989, near 1900 West 91st Street in Chicago as she was walking to a nearby commuter train station. In the course of their investigation, Chicago police officers recovered evidentiary items containing bodily fluid, including semen, from the body and clothing of the victim.

The police submitted the evidentiary samples to the DNA analysis unit of the FBI, along with blood samples of defendant and the victim. At the specific request of the FBI, the police also submitted a blood sample of the victim's husband. The FBI analyzed the samples using the restriction fragment length polymorphism (RFLP) technique. The analysis indicated that the DNA profiles in the evidentiary samples "matched" the DNA profile of defendant. The FBI then calculated an estimate of the probability that a person chosen at random from the black population would match this DNA profile. That probability was determined to be 1 in 90 million.

At the *Frye* hearing, which spanned several weeks and generated over 1,500 pages of transcript, the court heard expert testimony from three witnesses for the State and four for the defendant. The State's witnesses and their backgrounds are as follows: (1) Dr. Charles Strom, director of the DNA laboratory at Illinois Masonic Hospital in Chicago, qualified as an expert in the areas of molecular genetics and molecular biology; (2) Dr. Harold Deadman, supervising special agent in charge of the FBI's DNA analysis unit, qualified as an expert in forensic chemistry and called to offer his expert opinion regarding DNA profiling in the field of forensics and as a rebuttal witness; and (3) Dr. Michael Conneally, distinguished professor of medical genetics and neurology at Indiana University Medical Center, qualified as an expert in the field of human population genetics. The following witnesses testified for defendant: (1) Dr. Randell Libby, assistant professor of genetics at the University of Washington, qualified as an expert in the fields of molecular biology, molecular genetics and forensic DNA analysis; (2) Dr. Jerry Coyne, associate professor of ecology and evolution at the University of Chicago, qualified as an

expert in the areas of population genetics, evolutionary biology and biostatistics; (3) Dr. Seymour Geisser, director of the school of statistics at the University of Minnesota, qualified as an expert in biostatistics and probability theory; and (4) Dr. Lawrence Mueller, associate professor of ecology at the University of California at Irvine, qualified as an expert in the fields of population genetics and evolutionary biology.

The court also considered some 68 exhibits consisting primarily of published articles and reports pertaining to DNA testing as well as opinions issued by courts outside this jurisdiction which have addressed the admissibility of DNA profiling evidence in a criminal trial.

Following the hearing, the trial court issued an order granting defendant's motion to exclude the DNA evidence along with a scholarly and detailed 36-page opinion explaining the reasons for its decision. In particular, the trial court found that, while the scientific theory underlying DNA testing and the RFLP technique used by the FBI to determine a match are generally accepted in the relevant scientific community, the methodology used to estimate the probability of a random match in the relevant population was not generally accepted. The trial court concluded that without the probability assessment, the jury would not know what to make of the fact that the DNA patterns "matched." Accordingly, the State's evidence of a match as well as the statistical assessment of the match were held inadmissible at trial.

In addressing the State's contention that the trial court erred in ruling the DNA evidence inadmissible at trial, a basic understanding of the theories and procedures involved in DNA profiling is essential to comprehend the legal issues surrounding its use as evidence in court. Therefore, we shall first consider the general nature of the particular evidence the State sought to have admitted. Our discussion of DNA and DNA profiling is derived primarily from testimony given at the *Frye* hearing and from a comprehensive and long-awaited report dealing with forensic DNA methodologies entitled "DNA Technology in Forensic Science" (hereafter referred to as "NRC Report"), which the National Research Council published in 1992 and to which both parties refer in their written briefs submitted in this court.

DNA profiling involves two distinct procedures. First, RFLP analysis determines if there is a match. A "match" does not mean that the suspect is with certainty the source of the genetic material found at the crime scene or on the victim, but only that the suspect cannot be eliminated as a potential source. Even if there is a perfect match

at four or five different loci, there is still a possibility that the two samples came from different people whose DNA patterns at those particular loci are indistinguishable. Thus, the second procedure, calculation of the probability of a random match, generates a ratio which accompanies a match, the purpose of which is to express the statistical likelihood that an unrelated person chosen at random from a particular population could have the same DNA profile as the suspect.

For criminal cases, DNA testing is of very recent advent. In October 1988, a court of review first considered the admissibility of DNA testing in the criminal context. (See Thompson & Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45, 46 n.4 (1989), citing *Andrews v. State* (Fla. App. 1988), 533 So. 2d 841 (hereafter Thompson and Ford).) In the years following *Andrews*, courts in more than 40 States have considered DNA evidence in hundreds of cases. NRC Report, at 21-22.

Deoxyribonucleic acid, DNA, is found in the chromosomes contained in the nuclei of cells. It provides the genetic blueprint which determines the physical structures and individual characteristics of every living organism. In humans, DNA exists in all cells that have a nucleus, including white blood cells, cells surrounding hair roots, and cells found in sperm and saliva.

With exceptions not relevant here, DNA does not vary within an individual, *i.e.*, the DNA contained in one cell in an individual will be identical to the DNA contained in every other cell of that individual. The important feature of DNA for forensic purposes is that, with the exception of identical twins, no two individuals have the same DNA structure.

A molecule of DNA is shaped like a double helix and resembles a twisted ladder or spiral staircase. The sides of this ladder, which are composed of phosphate and sugar molecules, are connected by "rungs" made up of pairs of molecules called "bases" (also referred to as nucleotides). The critical components of the ladder are these rungs. There are four types of bases in the DNA molecule, and they are designated as adenine (A), guanine (G), cytosine (C), and thymine (T). The bases bond in predictable patterns, A to T and C to G. This strict complementary pairing means that the order of the bases on one side of a DNA ladder will determine the order on the other side. The order in which these base pairs appear on the DNA ladder constitutes the genetic code for the cell. This code carries the necessary information to produce the myriad proteins which comprise the human body. Because human beings share more biological similarities than differences, well over 90% of the DNA molecules, or base pair sequences,

in each human are the same. Certain sections of the DNA ladder, however, take different forms in different individuals. These areas of variation, called "polymorphisms," provide the basis for DNA identification and produce great significance for forensic testing.

A sequence of base pairs responsible for producing a particular protein or characteristic is called a "gene" (*e.g.*, each person has a gene for the production of eyes). Some genes are polymorphic and may have two or more different versions called "alleles" (*e.g.*, blue-eyed allele, green-eyed allele). The total fragment length of a polymorphism is called a "Restriction Fragment Length Polymorphism (RFLP)"—hence the name given to the FBI's matching procedure—and its length is determined by the number of repeat core sequences of base pairs, which are called "Variable Number Tandem Repeats" (VNTRs). A particular region on the DNA molecule where a specific VNTR occurs is called a "locus." A locus is considered polymorphic when the number of VNTRs varies from individual to individual.

Because it is impractical to examine all the polymorphic regions of the DNA molecule, DNA profiling focuses on several highly polymorphic or "hypervariable" segments of DNA. Different people will have the same VNTRs in a particular hypervariable locus, but the loci will differ in length because varying numbers of the VNTRs are linked together. One person, for instance, may have a particular locus in which a given core sequence repeats only 10 times, whereas that same locus in another person may contain the same VNTR that repeats 100 times. Although a person may not have a unique polymorphic area at any one locus, the frequency with which two people will exhibit 8 or 10 identical alleles at four or five different loci is extremely low. (There are two alleles which occupy the same locus on a DNA molecule; one is inherited from the mother and one from the father. When the alleles that comprise a pair differ, the individual is said to be "heterozygous" for that allele. When the maternal and paternal alleles in a pair are the same, the individual is "homozygous" for that allele.)

DNA analysis is generally performed by disassembling the ladder in one of several ways. The FBI, as well as two commercial laboratories, Cellmark and Lifecodes, uses the RFLP method of analysis. The operative steps of RFLP analysis, as utilized by the FBI, are outlined below:

1. *Extraction of DNA.* The DNA is first extracted from a sample of certain tissue or bodily fluid, such as blood or semen, by using chemical enzymes and is then purified.

2. *Restriction or Digestion.* The DNA is then "cut" into smaller fragments with chemical scissors called restriction enzymes. These

enzymes recognize certain base pairs and sever the DNA molecule at specifically targeted base pair sites to produce RFLPs.

3. *Gel Electrophoresis.* The cut fragments of DNA molecules are next placed in an agarose gel which is later electrically charged to sort the fragments by length. The electric current causes the fragments to migrate through the gel. The distance traveled depends upon the length of the fragment; the shorter fragments, because they are lighter, will travel farther in the gel. Fragments of known base pair lengths, called molecular weight markers, are placed in separate lanes to allow the measurement of RFLPs in units of base pairs. Several different samples are run on the same gel, but in different lanes.

4. *Southern Transfer or Blotting.* Because the agarose gel is difficult to work with, the RFLPs are transferred to a more functional surface by a method called "Southern transfer." A nylon membrane is placed over the gel, causing the RFLPs to move onto the membrane. The RFLPs then become permanently affixed to the membrane, referred to as a "blot," in the same pattern as in the gel. Also during this step, a denaturization process severs each double-stranded DNA fragment into two single strands—one inherited from the mother and one from the father.

5. *Hybridization.* In this step, a genetic probe is used to locate a specific locus of a polymorphic region of the DNA on the blot. A genetic probe is a single-stranded segment of DNA designed to complement a single-stranded base sequence that is associated with a particular locus on a chromosomal pair. The probe will bond with any single-stranded fragments containing that particular base sequence. The normal result is that the probe will bind to DNA fragments, or RFLPs, at one or two locations in each lane, depending on whether the individual is homozygous or heterozygous for that particular allele. The genetic probe is tagged with a radioactive marker, which attaches to the probe and emits radiation without altering the function of the probe. The marker is used to determine the probe's position on the blot after it hybridizes with a polymorphic segment.

6. *Autoradiography.* Next, the nylon membrane is placed in contact with a piece of X-ray film where the radioactive probes expose the film at their respective locations. Black bands appear where the radioactive probes have bonded to the RFLPs, producing a DNA "print." Typically, each probe will expose one or two bands for each DNA sample, which reflects the maternal or paternal contributions to the individual's DNA profile. The position of each band indicates the location of a polymorphic segment on the blot. Location, in turn, indicates the length of the DNA fragment that contains the polymor-

phic DNA segment. Since the length of the DNA fragments varies among individuals, the position of their bands on a DNA print can differentiate individuals.

After the first probe has been applied and the autoradiography process is complete, the first probe is removed from the membrane. The hybridization and autoradiography processes are then repeated on the same membrane using a second probe. This process is designed to locate a different VNTR base sequence on another chromosomal pair. The FBI usually repeats the two processes using four or five different probes sequentially on a single blot. Several probes are necessary because although the degree of individualization for the two alleles that occur on one locus is not high, it is, as stated, extremely rare for two people to have 8 or 10 matching alleles across four or five different loci.

7. *Interpretation of Autoradiographs.* The last step in the RFLP analysis conducted by the FBI is to determine if a match exists in the two lanes of the autoradiograph ("autorad") between the DNA sample taken from the suspect and the forensic sample taken from the crime scene or victim. The FBI uses a two-step procedure for deciding whether a match exists. First, the FBI looks for a visual match. A visual match means that the forensic sample of DNA and the suspect's DNA have the same number of bands in approximately the same locations on each autorad. If no visual match exists, the FBI decides whether the nonmatch should be interpreted as inconclusive or as excluding the suspect. If a visual match is declared, however, the FBI uses a computer-assisted process to verify the existence of a match. A computer imaging process is used to reference the bands to the molecular weight markers on the autorad. Because these reference points have a known value in base pair units, the number of base pairs in the polymorphic sequence represented by the band on the autorad can be measured.

Because of inherent limitations in the DNA processing system, it is not possible to measure the sample fragments to the precise number of base pairs. Thus, a margin of error is built into the matching system. Under the FBI's method, if the size of the suspect's DNA fragments and the forensic samples are within plus or minus 2.5% in terms of the number of base pairs, then the visual match is confirmed and the FBI will proclaim a match for that particular RFLP. If the difference between the two exceeds 2.5%, then the autorad is considered either inconclusive or as an exclusion of the suspect.

Once the suspect's DNA profile is declared to match the forensic sample, the FBI draws upon the discipline of population genetics to calculate the likelihood of a random match. The statistical signifi-

cance of a match is measured by the frequency with which a pattern of alleles occurs in a specific population. The FBI first determines the frequency with which each *individual* allele occurs in a particular population by using an approach known as "fixed bin analysis." A bin is an arbitrarily defined range of base pairs. Any allele with a base pair length within that range is classified as belonging to that bin.

The FBI then samples a targeted population to establish a data base of allele frequencies. The FBI has compiled data bases for Caucasian, black, Asian and Hispanic populations. The FBI's black data base at issue here was derived from blood samples of approximately 300 individuals from South Carolina, Miami, and Texas. The end result of the FBI's fixed bin analysis of RFLPs from a forensic sample is a statistic which estimates the probability that the DNA profile of an individual chosen at random from a given population might match the DNA profile of the forensic sample for the targeted VNTR loci. To calculate this statistic, the FBI applies the "product rule," whereby the population frequencies of all alleles detected in a DNA sample are multiplied to yield an estimate of how common that DNA profile is in a given population.

In the present case, the FBI determined that the chance that an unrelated individual chosen at random from the black population would have a DNA profile matching the forensic sample pattern (with a four-probe match) was 1 in 90 million. (Sometime after the DNA profiling analysis that is the subject of this appeal was performed, the FBI's black data base was replaced with a new data base, after 60 duplicate samples in the original black data base were detected. Using the new black data base, the FBI calculated the probability of selecting an unrelated individual at random from the black population having a DNA profile matching the forensic sample profile at all four loci to be 1 in 116 million. Pursuant to internal guidelines, however, the FBI determined that the DNA profiles obtained at one of the four loci were inconclusive, resulting in an adjusted probability assessment for a three-loci match of approximately 1 in 3.5 million.)

Having discussed the technical workings of DNA and DNA analysis, we turn now to our legal discussion concerning the admissibility of DNA profiling evidence in Illinois. We first address the applicable scope of review. Generally, the decision whether to admit expert testimony is committed to the sound discretion of the trial court. (*People v. Eyler* (1989), 133 Ill. 2d 173, 211-12, 549 N.E.2d 268, 285.) Where the question of the general acceptance of a new scientific technique is raised, however, the proponent of the technique will

often be requesting the court to establish the law of the jurisdiction for future cases. This is certainly true in the present instance. Accordingly, in recognition of the fact that the formulation of the law is a "quintessentially appellate function" (*United States v. Porter* (D.C. 1992), 618 A.2d 629, 635), we engage in a broad review of the trial court's determination with respect to the general acceptance of forensic DNA analysis. In doing so, we may look not only to the expert evidence presented in the trial court but also to judicial opinions from other jurisdictions as well as pertinent legal and scientific commentaries.

Our approach to reviewing the general acceptance of forensic DNA analysis has found accord in the courts of other jurisdictions. In *State v. Vandebogart* (1992), 135 N.H. 365, 616 A.2d 483, for instance, the court, in rejecting the State's argument that the abuse of discretion standard should prevail, held that "whether a scientific theory and the technique used to implement it are generally accepted does not vary according to the circumstances of each case, and thus the determination of general acceptance is not a matter to be left to each trial judge's individual discretion." *Vandebogart*, 135 N.H. at 376, 616 A.2d at 491. See also *People v. Barney* (1992), 8 Cal. App. 4th 798, 810, 10 Cal. Rptr. 2d 731, 737; *Commonwealth v. Curnin* (1991), 409 Mass. 218, 223, 565 N.E.2d 440, 443.

Illinois follows the legal standard of admissibility of novel scientific evidence originally set forth in *Frye* (293 F. 1013). (See *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070; *Eyler*, 133 Ill. 2d 173, 549 N.E.2d 268.) At this juncture, we find it appropriate to note our recognition of the recent decision of the United States Supreme Court—*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786—in which the Court held that the *Frye* test, "absent from and incompatible with the Federal Rules of Evidence, should not be applied in federal trials." (*Daubert*, 509 U.S. at 589, 125 L. Ed. 2d at 480, 113 S. Ct. at 2794.) *Daubert* does not by its terms, however, apply to State court proceedings. Accordingly, until such time as our supreme court ceases to recognize the *Frye* test as the applicable standard for admitting novel scientific evidence in this State, we shall continue to apply it.

In *Frye*, the court stated:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction

is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

As the foregoing excerpt makes clear, the *Frye* standard prohibits the use of new scientific evidence unless the technique used has gained acceptance within the relevant scientific community. (*People v. Thomas* (1990), 137 Ill. 2d 500, 517, 561 N.E.2d 57, 63.) Although more than 40 years have passed since scientists James Watson and Francis Crick were awarded the Nobel Prize for their discovery of the structure of DNA (*Porter*, 618 A.2d at 633), the application of DNA technologies in the field of forensic science is of relatively recent origin. (*People v. Wesley* (1988), 140 Misc. 2d 306, 307-11, 533 N.Y.S.2d 643, 644-46.) This appeal, therefore, presents the very sort of issue which the quoted language from *Frye* was intended to address. The burden is on the State to prove that the *Frye* test has been met (*People v. Lipscomb* (1991), 215 Ill. App. 3d 413, 430, 574 N.E.2d 1345, 1356), and, though not discussed in the cases applying the *Frye* standard in this State, neither party disputes that the standard of proof appears to be a preponderance of the evidence.

■ In applying the *Frye* standard to the issue presented in this case, we must first address the threshhold question concerning how the "relevant scientific community" is to be defined. The State contends that the relevant scientific community to which the test of general acceptance is to be applied is that of forensic scientists, who "universally accept[ ] the DNA profiling test utilized by the FBI." Defendant, on the other hand, strenuously contests this narrow definition, arguing that what makes one a relevant expert is not the performance of a particular number of forensic tests, but rather the possession of education, experience and skills which provide a theoretical and practical knowledge and understanding of the principles and procedures at issue at a level superior to that of the average layperson.

We find the following language from the *Porter* case to be instructive in this regard:

"It simply is not creditable to argue, and the government does not do so with much enthusiasm, that general acceptance may be premised simply on the opinion of forensic scientists. Were it otherwise, there would have been no need for a month-long *Frye* hearing. There is no question but that forensic scientists accept—no qualifier is necessary—forensic DNA evidence and believe that the time has come for its use as powerful evidence in criminal trials. While views of forensic scientists have weight and must be considered, 'members of the relevant scientific field will

include those whose scientific background and training are sufficient to allow them to comprehend and understand the process and form a judgment about it.' " (*Porter*, 618 A.2d at 634, quoting *Reed v. State* (1978), 283 Md. 374, 382, 391 A.2d 364, 368.) Applying the formulation set forth in *Reed*, the *Porter* court held that the relevant scientific community was composed not only of forensic scientists but molecular biologists and population geneticists as well. The court so held after finding that DNA profiling was merely an amalgamation of the latter two disciplines. (*Porter*, 618 A.2d at 635.) The trial court in the present case concurred in this view. The court opined that too narrow a definition of the pertinent scientific community would render the *Frye* standard meaningless and ineffective. Accordingly, the court concluded that the general acceptance of the proposed DNA profiling evidence should be evaluated by scientists in the fields of molecular biology, population genetics and forensic science. We agree with the trial court.

In so holding, we are mindful of the *Eyler* decision in which our supreme court, in determining the admissibility of evidence pertaining to electrophoresis testing, concluded that the relevant scientific community was limited to forensic scientists. However, we believe, as the trial court did, that where an innovative principle or procedure is derived from or developed by other well-recognized disciplines, the body of expertise within the field of forensic science may well be limited. This is particularly the case here where application of DNA principles and procedures to the field of forensic science is of relatively recent origin. Because forensic science draws from other identified fields, such as molecular biology and population genetics, in performing DNA profiling analyses, we believe the more sensible approach would be to broaden the scientific community to include as well those with expertise in these particular disciplines. We have found overwhelming support for this view in the decisions of other courts which have confronted this issue. See, *e.g., Lipscomb*, 215 Ill. App. 3d 413, 574 N.E.2d 1345; *Fishback v. People* (Colo. 1993), 851 P.2d 884; *State v. Bible* (1993), 175 Ariz. 549, 858 P.2d 1152; *Vandebogart*, 136 N.H. 365, 616 A.2d 483; *People v. Pizarro* (1992), 10 Cal. App. 4th 57, 12 Cal. Rptr. 2d 436; *Commonwealth v. Lanigan* (1992), 413 Mass. 154, 596 N.E.2d 311; *People v. Mohit* (1992), 153 Misc. 2d 22, 579 N.Y.S.2d 990; *Barney*, 8 Cal. App. 4th 798, 10 Cal. Rptr. 2d 731; *United States v. Yee* (N.D. Ohio 1991), 134 F.R.D. 161.

Having thus determined the scope of the relevant scientific community, we turn now to the question of whether the trial court erred in excluding the State's DNA profiling evidence. At the *Frye* hearing, defendant's challenge to the DNA profiling evidence was

twofold. First, he challenged the reliability of the FBI's methods and procedures used in determining a match. Second, he challenged the scientific bases underlying the FBI's method of estimating the probability of a random match. With respect to the FBI's methods for declaring a match, defendant challenged, *inter alia*, the following:

(1) The FBI's failure to replicate test results;

(2) The inability of the FBI to precisely measure the VNTR;

(3) The lack of adequate proficiency testing;

(4) The absence of uniform standards governing forensic DNA typing;

(5) The risk of band shifting arising from, among other things, the use of ethidium bromide in the agarose gel and contamination from foreign substances, and the inability to detect band shifting with existing probes; and, in view of the foregoing,

(6) the alleged existence of a significant danger that a false positive could be called a match.

Defendant raises these same contentions in this court in an effort to persuade us that the trial court erred in holding that the FBI's methodology for determining a match is generally accepted, and that defendant's challenges affected only the weight and not the admissibility of the evidence. We are not so persuaded. Rather, for the reasons which we shall shortly set forth, we find that the trial court properly determined that the FBI's methodology for determining a match is generally accepted in the relevant scientific community. Before we reach this issue, however, a preliminary comment on the general acceptance of the theory underlying DNA profiling is appropriate. We shall then turn our attention to the heart of this appeal—the question whether the FBI's determination of a match's statistical significance has received general acceptance.

Defendant does not contest that the theory underlying DNA profiling is generally accepted. Indeed, reputable commentators have noted:

"There is nothing controversial about the theory underlying DNA typing. Indeed, this theory is so well accepted that its accuracy is unlikely even to be raised as an issue in hearings on the admissibility of the new tests. *** The theory has been repeatedly put to the test and has successfully predicted subsequent observations." Thompson & Ford, at 60-61.

See also *People v. Castro* (1989), 144 Misc. 2d 956, 960-63, 545 N.Y.S.2d 985, 989.

■ Based on our review of the record and applicable literature, we too conclude that the theory underlying DNA profiling is generally accepted in the relevant scientific community.

We similarly find, in full agreement with the trial court, that the

FBI's RFLP matching technique is also generally accepted in the relevant scientific community. Since the *Frye* hearing in this case, both the Fourth and Fifth District Appellate Courts of this State have affirmed the admissibility of evidence indicating a DNA match using the RFLP technique. (*Lipscomb*, 215 Ill. App. 3d 413, 574 N.E.2d 1345; *People v. Miles* (1991), 217 Ill. App. 3d 393, 577 N.E.2d 477, *People v. Mehlberg* (1993), 249 Ill. App. 3d 499, 618 N.E.2d 1168.) While these cases certainly provide precedent for upholding the ruling of the trial court in the present case, we are reluctant, however, to place undue reliance on them because in each instance there was a complete absence of opposing scientific perspectives challenging the DNA evidence, a factor which, at least in part, led the courts to conclude that the matching procedures were generally accepted. In the present case, on the other hand, defendant presented the testimony of several experts who vigorously challenged the State's contention that the FBI's matching procedures are generally accepted. In light of this, we would consider it imprudent to rely solely on the aforementioned cases—cases "devoid of expert evidence from the party resisting admission of [the] DNA evidence" (*State v. Anderson* (1993), 115 N.M. 433, 439, 853 P.2d 135, 141)—to affirm the trial court's finding of general acceptance.

We thus search for additional support in the judicial decisions of other jurisdictions where, as here, expert testimony was presented both by the proponent and opponent of the DNA evidence. In the overwhelming number of such cases, the FBI's RFLP matching technique was held to be generally accepted in the scientific community. (See, *e.g.*, *State v. Johnson* (Minn. 1993), 498 N.W.2d 10; *State v. Alt* (Minn. App. 1993), 504 N.W.2d 38; *Mohit*, 153 Misc. 2d 22, 579 N.Y.S.2d 990; *Vandebogart*, 136 N.H. 365, 616 A.2d 483; *Porter*, 618 A.2d 629; *State v. Jobe* (Minn. 1992), 486 N.W.2d 407; *Yee*, 134 F.R.D. 161.) In these cases, most if not all of the same challenges defendant raised here were made, and in every instance the courts held that the challenges affected the weight, not the admissibility, of the evidence. We note from the record that the trial court addressed defendant's contentions with respect to the FBI's matching procedures in considerable detail before concluding that they spoke only to the weight of the evidence, and were proper subjects of cross-examination before a jury, to be considered by the jury in assessing the value of the FBI's stated "match."

The recent NRC Report has generally reinforced the trial court's view. At an April 14, 1992, press conference, Dr. Victor McKusick, chairman of the Committee on DNA Technology in Forensic Science (Committee), which prepared the NRC report, reiterated the

Committee's general recommendation that "courts accept the reliability of the [DNA] technology and recognize that current laboratory techniques are fundamentally sound." (Federal News Service, April 14, 1992.) Dr. Deadman and Dr. Strom testified for the State that the general scientific community accepts the FBI's protocol and procedures for determining a match of DNA profiles. While defendants' experts pointed to various flaws in the FBI's matching procedures—many of which are enumerated above—we are nevertheless persuaded that the procedures are capable of reliably discerning matches across multiple loci. Dr. Libby, a defense witness, in fact conceded that the RFLP technique could be used for forensic purposes if proper controls are implemented. In this regard, Dr. Deadman testified that the FBI is in compliance with the guidelines set forth by the "Technical Working Group on DNA Analysis Methods" (TWGDAM). Moreover, in response to defendant's criticism regarding lack of peer review of the FBI's matching technique, we note that since the *Frye* hearing, the FBI's matching process has in fact been subjected, in the trial court's words, to the "correcting mechanism of the peer review process."

In affirming the trial court's finding of general acceptance, we by no means intend to disregard or discount the accuracy of many of defendant's criticisms regarding application of the FBI's matching procedures. We simply conclude, in light of what we have learned about the procedures, that it is extremely unlikely, if the procedures described in the FBI's protocol are followed, that an erroneous match could result—this being the ultimate fear of defendant. As we have stated, we are satisfied that the procedures utilized by the FBI are capable of giving reliable results, and we leave to a jury the determination of whether such results were attained in the present case. *Mehlberg*, 249 Ill. App. 3d at 541, 618 N.E.2d at 1197.

■ This brings us to the heart of this appeal, namely, whether the final step of DNA analysis—the determination of a match's statistical significance—has gained general acceptance in the relevant scientific community. After reviewing the expert testimony and existing legal and scientific authority, the trial court concluded that there was "substantial disagreement within the scientific community" as to the FBI's statistical methodology by which the possibility of a random match was calculated as being one in ninety million. The State initially contends that the trial court erred in treating the FBI's statistical calculation as a novel scientific principle subject to the *Frye* test. We disagree with the State. Moreover, after carefully reviewing the record and the relevant body of legal and scientific authority, we must agree with the trial court that the particular

methodology used by the FBI to generate a probability of 1 in 90 million was not generally accepted by the relevant scientific community, namely, population geneticists. We also agree with the trial court's conclusion that a probability assessment is essential in order to give meaning to a "match," and that absent such an assessment, the fact of the match, standing alone, is inadmissible at trial. See NRC Report, at 74 ("To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless"); see also *Yee*, 134 F.R.D. at 181 ("Without the probability assessment, the jury does not know what to make of the fact that the patterns match: the jury does not know whether the patterns are as common as pictures with two eyes, or as unique as the Mona Lisa").

We have found strong support for the trial court's findings in the decisions of courts outside Illinois, which have engaged in thoughtful and comprehensive analyses of this issue. We are particularly impressed with the careful and articulate analysis of the unanimous California appellate court in *Barney* (8 Cal. App. 4th 798, 10 Cal. Rptr. 2d 731), which considered many of the same arguments made both by the State and defendant in this case, and ultimately concluded that the FBI's statistical methodology lacked general scientific acceptance. In light of the quality of the court's analysis and its extraordinary relevance to the present case, we quote from it at length:

"There is currently a fundamental disagreement among population geneticists concerning the determination of the statistical significance of a match of DNA patterns. The dispute was recently featured in a leading scientific journal, Science, in which Richard C. Lewontin of Harvard University and Daniel L. Hartl of Washington University attack the reliability of DNA statistical analysis, while Ranajit Chakraborty of the University of Texas and Kenneth K. Kidd of Yale University defend it. (Lewontin & Hartl, *Population Genetics in Forensic DNA Typing* (Dec. 20, 1991) Science, at p. 1745 (hereafter Lewontin & Hartl) [cited by defendant]; Chakraborty & Kidd, *The Utility of DNA Typing in Forensic Work* (Dec. 20, 1991) Science, at p. 1735 (hereafter Chakraborty & Kidd) [cited by the State].)

Lewontin and Hartl question the reliability of the current method of multiplying together the frequencies with which each band representative of a DNA fragment appears in a broad data base. The problem, they say, is that this method is based on incorrect assumptions that (1) members of the racial groups represented by the broad data bases—Caucasians, Blacks, and

Hispanics—mate within their groups at random, i.e., without regard to religion, ethnicity, and geography, and (2) the DNA fragments identified by DNA processing behave independently and thus are 'independent in a statistical sense'—i.e., in the language of population genetics, they are in ' "linkage equilibrium." ' (Lewontin & Hartl, *supra*, at p. 1746.)

Lewontin and Hartl claim that, contrary to the assumption of random mating, ethnic subgroups within each data base tend to mate endogamously (i.e., within a specific subgroup) with persons of like religion or ethnicity or who live within close geographical distance. Such endogamous mating tends to maintain genetic differences between subgroups—or substructuring—which existed when ancestral populations emigrated to the United States and has not yet had sufficient time to dissipate. As a result, the subgroups may have substantial differences in the frequency of a given DNA fragment—or VNTR allele—identified in the processing step of DNA analysis. A given VNTR allele may be relatively common in some subgroups but not in the broader data base. (Lewontin & Hartl, *supra*, at pp. 1747-1749.)

There are purportedly two consequences of genetic substructuring and subgroup differences in allele frequencies: (1) it is inappropriate to use broad data bases to which all Caucasians, Blacks, and Hispanics may be referred for estimating frequencies, and (2) it is inappropriate to multiply frequencies together, for want of linkage equilibrium. The current multiplication method, using the Hardy-Weinberg equation (which requires statistical independence within a locus, or Hardy-Weinberg equilibrium) and the product rule (which requires statistical independence across loci, or linkage equilibrium) will be reliable only if there is extensive study of VNTR allele frequencies in a wide variety of ethnic subgroups. (Lewontin & Hartl, *supra*, at pp. 1748-1749.)

Lewontin and Hartl conclude that because the frequency of a given VNTR allele may differ among subgroups, reference to a broad data base may produce an inaccurate frequency estimate for a defendant's subgroup. The current multiplication method may greatly magnify the error. The resulting probability for the defendant's entire DNA pattern may be in error by two or more orders of magnitude (e.g., 1 in 7.8 million could really be 1 in 78,000). (Lewontin & Hartl, *supra*, at p. 1749.)

Chakraborty and Kidd strongly disagree. They contend that Lewontin and Hartl exaggerate both the extent of endogamy in contemporary America and the effect of substructuring on the reliability of DNA statistical analysis. They concede there is substructuring [as did Dr. Deadman in the present case] (and thus variance of VNTR allele frequencies) within the data bases, but

assert its effect on the reliability of frequency estimates is 'trivial' and 'cannot be detected in practice.' (Chakraborty & Kidd, *supra*, at pp. 1736-1738.)

In an article introducing the Lewontin-Hartl and Chakraborty-Kidd articles, Science describes Lewontin and Hartl as 'two of the leading lights of population genetics' who 'have the support of numerous colleagues.' (Roberts, *Fight Erupts Over DNA Fingerprinting* (Dec. 20, 1991) Science, at p. 1721 (hereafter *Fight Erupts*).) [Relied on by defendant in the present case in arguing against general acceptance.] A population geneticist at the University of California at Irvine is said to agree 'that the current statistical methods could result in "tremendous" errors and should not be used without more empirical data.' (*Id.*, at p. 1723.) The introductory article describes the debate as 'bitter' and 'raging,' stating that 'tempers are flaring, charges and countercharges are flying.... [¶] Dispassionate observers, who are few and far between, say that the technical arguments on both sides have merit.... [T]he debate is not about right and wrong but about different standards of proof, with the purists on one side demanding scientific accuracy and the technologists on the other saying approximations are good enough.' (*Id.*, at p. 1721.) Science concludes that the Lewontin-Hartl and Chakraborty-Kidd articles 'seem likely to reinforce the notion that the [scientific] community is indeed divided' under the *Frye* standard, although the issue may become moot within a few years 'with the expected introduction of even more powerful DNA techniques....' (*Id.*, at p. 1723.)

The NRC report, which was released four months after the Science articles, acknowledges there is a '[s]ubstantial controversy' concerning the present method of statistical analysis. (NRC rep., *supra*, at p. 74.) The report does not, however, choose sides in the debate, but instead 'assume[s] for the sake of discussion that population substructure may exist....' (NRC rep., *supra*, at pp. 12, 80; see also *id.* at p. 94.)

\* \* \*

Evidently, Lewontin and Hartl—along with their colleagues who agree with them—are significant in both ' "number" ' and ' "expertise." ' [Citation.] Science describes Lewontin and Hartl as 'two of the leading lights of population genetics' who 'have the support of numerous colleagues,' and quotes a third population geneticist (Francisco Ayala) who agrees with the above criticism. (*Fight Erupts, supra*, at p. 1721.) Lewontin has been described by one of his colleagues as ' "probably regarded as the most important intellectual force in population genetics alive." ' (*U.S. v. Yee* (N.D. Ohio 1991), 134 F.R.D. 161, 181.) Similar criticisms of the

statistical calculation process of DNA analysis have been leveled by other scientists in previous publications, some of which were admitted in evidence below (*e.g.*, Lander, *DNA Fingerprinting on Trial* (June 15, 1989) Nature, at pp. 501, 504 [cited by defendant in the present case]; Cohen, *DNA Fingerprinting for Forensic Identification: Potential Effects on Data Interpretation of Subpopulation Heterogeneity and Band Number Variability* (1990) 46 Am. J. Hum. Genetics 358, 367) \*\*\*. \*\*\*

Of course, Chakraborty and Kidd strongly disagree, and according to Science they have 'many scientific supporters.' (*Fight Erupts, supra*, at p. 1721 \*\*\*.) But the point is not whether there are more supporters than detractors, or whether \*\*\* the supporters are right and the detractors are wrong. The point is that there is disagreement between two groups, each significant in both number and expertise (a '[s]ubstantial controversy,' in the words of the NRC report). (NRC rep., *supra*, at p. 74.) Even Science, which purportedly sought balance in its coverage of this dispute by commissioning the Chakraborty-Kidd article as a rebuttal to the Lewontin-Hartl article (Roberts, *Was Science Fair to its Authors?* (Dec. 20, 1991) Science, at p. 1722), recognized that the competing articles 'seem likely to reinforce the notion that the [scientific] community is indeed divided' under the *Frye* standard. (*Fight Erupts, supra*, at p. 1723.)

Our task under *Kelly-Frye* [*People v. Kelly* (1976), 17 Cal. 3d 24, 130 Cal. Rptr. 144, 549 P.2d 1240] is not to choose sides in this dispute over the reliability of the statistical calculation process. Once we discern a lack of general acceptance—which in this instance is palpable—we have no choice but to exclude the 'bottom line' expression of statistical significance in its current form."

*Barney*, 8 Cal. App. 4th at 814-19, 10 Cal. Rptr. 2d at 740-43; accord *Commonwealth v. Lanigan* (1992), 413 Mass. 154, 596 N.E.2d 311; *Mohit*, 153 Misc. 2d 22, 579 N.Y.S.2d 990; *State v. Alt*, 504 N.W.2d 38; *State v. Anderson*, 115 N.M. 433, 853 P.2d 135; *Porter*, 618 A.2d 629; *Vandebogart*, 136 N.H. 483, 616 A.2d 483.

Since, as we have stated, the probability of a coincidental match is an essential part of the DNA evidence, and since there is no consensus as to the accuracy of the FBI's statistical calculation, we decline to accept the State's assertion that the defense objections to that precise calculation go only to its weight. The lack of general acceptance among relevant scientists of the proposition that the FBI's "fixed bin" methodology is sufficiently reliable to support a coincidental match probability of 1 in 90 million (or 1 in 3.5 million for a three-probe match using the new black data base), however, does not necessarily lead us to the conclusion that no probability estimate at

all may be presented to the jury. As we shall explain, demonstration of a consensus within the appropriate scientific community as to a more conservative approach to determining the statistical significance of a match would be sufficient for the DNA evidence to be admitted at trial.

The Committee on DNA Technology in Forensic Science has recommended just such an approach in its recently published NRC Report, a report to which defendant gives considerable credence. The approach, known as the "ceiling principle," permits the calculation of the chance of a random match in a manner which takes into account the criticisms leveled by opponents of the FBI's methodology, most notably the possibility of population substructuring. The principle eliminates ethnicity as a factor in the calculation process and allows the use of the product rule while ensuring that probability estimates are appropriately conservative. (*Barney*, 8 Cal. App. 4th at 821-22, 10 Cal. Rptr. 2d at 745.) As explained in the NRC Report, the approach would essentially require 15 to 20 homogeneous populations to be analyzed for allele frequencies. Then, in subsequent analysis of a DNA sample taken from the suspect or crime scene, each allele would be assigned the highest frequency that appears in the tested populations, or 5%, whichever is greater. These frequencies would then be multiplied together using the product rule. (NRC Report at 12-13, 82-83, 95.) According to the Committee, use of the ceiling principle yields the same frequency of a given genotype (that is, the genetic makeup of an individual), regardless of a suspect's ethnic background, because the reported frequency represents a maximum for any possible ethnic heritage. (NRC Report at 13.) The Committee opined that "[t]he calculation [derived by the ceiling principle] is fair to suspects, because the estimated probabilities are likely to be conservative in their incriminating power." NRC Report at 13.

Since the ceiling principle may not be employed until the proper population sampling is computed, however, the Committee has formulated a "modified ceiling principle" approach which is, in effect, "a more conservative version of the conservative ceiling principle." (*Porter*, 618 A.2d at 643.) The modified ceiling principle may be utilized immediately since the frequencies are taken from existing data bases. Using the modified ceiling principle approach, in applying the product rule the 95% upper confidence limit of the frequency of each allele should be calculated for separate United States "racial" groups and the highest of these values or 10% (whichever is the larger) should be used to calculate the statistical probability of a random match. Data on at least three major "races" (*e.g.*, Caucasian, black, Hispanic, Asian, Native American) should be analyzed.

■ The Committee has concluded that when a particular statistical methodology or estimate is called into question, as it was here, "[t]he solution *** is not to bar [the] DNA evidence, but to ensure that estimates of the probability that a match between a person's DNA and evidence DNA could occur by chance are appropriately conservative." (NRC Report, at 134.) We agree with this approach. Moreover, we believe that the calculation of an "appropriately conservative" probability estimate—one which will satisfy the dictates of *Frye*—may now be possible using the Committee's preferred ceiling (or modified ceiling) principle technique.

Because the match of DNA patterns is a matter of substantial significance (see NRC report, at 74 ("[A] match between two DNA patterns can be considered strong evidence that the two samples came from the same source")) and because this case has the potential for becoming a significant precedent in this jurisdiction, we believe the trial court should be given the opportunity to determine whether the recently promulgated ceiling principle is appropriate under *Frye* for calculating the probability estimate to be applied to a match declaration in the present case. Accordingly, we remand this cause to the trial court for such a determination. At least in our view, the NRC Report, which was not previously available to the trial court, suggests that the DNA evidence should be admitted on the basis of this more conservative probability calculation for which the requisite consensus may now exist. Indeed, the Committee itself is a distinguished cross-section of the scientific community which is composed, in part, of outspoken critics of the FBI's current methodology. (*Porter*, 618 A.2d at 643.) This fact was particularly significant to one trial court, which thus concluded that the " '[C]ommittee's [finding] regarding the reliability of forensic DNA typing, specifically RFLP analysis, and the proffer of a conservative method for calculating probability estimates can easily be equated with general acceptance of those methodologies in the relevant scientific community.' " (*Porter*, 618 A.2d at 643 n.26, quoting *United States v. Bridgett* (Super. Ct. D.C. 1992), 120 Daily Wash. L. Rptr. 1697, 1702.) We leave the decision whether to adopt that view to the trial court, which will have the opportunity to study the recommendations set forth in the NRC Report and to hear and carefully consider defendant's arguments in opposition to the Committee's recommended approach.

If on remand the trial court concludes that the ceiling principle is generally accepted in the relevant scientific community (thus satisfying the *Frye* standard), it must then determine, using this principle, the appropriate probability estimate to be admitted at trial along with evidence of the match between defendant's DNA and the

DNA contained in the specimens taken from the victim's body. If, on the other hand, the trial court concludes that the Committee's proferred approach does not meet the *Frye* test, then the trial court is instructed to exclude all of the State's DNA evidence at trial.

For the foregoing reasons, the trial court's order granting defendant's motion to exclude the DNA profiling evidence is vacated and the cause is remanded to the trial court for further proceedings consistent with this opinion.

Order vacated and cause remanded.

EGAN, P.J., and RAKOWSKI, J., concur.