594 A.2d 1248

**Sandra Sue MYERS, Personal Representative of the Estate Of Charles W. Poore, et al.**

v.

**The CELOTEX CORPORATION, et al.**

**No. 1120, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Sept. 10, 1991.

Edward J. Lilly (Peter G. Angelos, on the brief), Baltimore, for appellants.

Gerry H. Tostanoski (John B. Isbister, Lisa K. Hoffman, Gerry E. Hoban and Tydings & Rosenberg, on the brief, for appellee, Fibreboard Corp.), Baltimore, for appellees.

NO BRIEF for Appellee, Celotex Corp.

Argued before ALPERT, BLOOM and MOTZ, JJ.

BLOOM, Judge.

At the conclusion of the first phase of a trifurcated asbestos trial in the Circuit Court for Baltimore County, the jury found that none of the plaintiffs' decedents had contracted an asbestos-related disease. Accordingly, the trial court ordered the entry of judgment in favor of appellees, Fibreboard Corporation and The Celotex Corporation, the only defendants that remained in the case through the first phase.[1]

In this appeal from that judgment, appellants, the surviving spouses and personal representatives of the estates of Charles Poore, Milton Brush, Vernon A. Cullum, James Fulton, Edwin Nelson, Arthur Homer, and Joseph Maresh, present the following issues for our consideration:

1. Whether the trial court abused its discretion in ordering that the trial be trifurcated.

2. Whether the trial court erred in communicating with members of the jury in the absence of counsel for the parties.

3. Whether the trial court employed an improper standard in excluding the opinion testimony of appellants' medical expert witness.

4. Whether appellants were denied due process of law.

We are not persuaded that the trial court abused its discretion in trifurcating the trial, but we conclude that the court unduly restricted appellants' ability to present evidence during the first phase regarding the decedents' exposure to products containing asbestos. Further, we agree with appellants that the trial court employed an improper standard in excluding the opinion testimony of their medical

---

1. After this appeal was noted, The Celotex Corporation filed for protection under Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court for the Middle District of Florida, as a result of which all proceedings against that corporation have been stayed. Accordingly, The Celotex Corporation did not file a brief or otherwise participate in this appeal.

expert. Accordingly, we shall reverse the judgment on those grounds and remand the case for a new trial. We need not and shall not address appellant's remaining contentions.

## *Facts*

Appellants, surviving spouses and personal representatives of the estates of workmen who died of cancer allegedly caused by extensive exposure to asbestos, brought actions in the Circuit Court for Baltimore County against numerous manufacturers, producers, distributors, and suppliers of various products containing asbestos. Decedents Fulton and Nelson, plumbers who allegedly worked for many years with asbestos pipe insulation material, died of lung cancer. Decedents Poore, Brush, and Cullum, ironworkers who allegedly worked for many years in enclosed areas in close proximity to plumbers using asbestos insulation material, also died of lung cancer. Decedents Homer and Maresh, operators of heavy construction equipment, such as cranes and loaders, who worked for many years in areas in which asbestos products were used, died of colon cancer.[2]

The plaintiffs were originally divided into groups, classified according to the decedents' occupations, and initially each group was scheduled for a separate trial. A jury pool was assembled, and the potential jurors were asked, *inter alia,* whether they would be able to serve for a four week period, since that was the average length of time for similar cases previously tried. Those potential jurors who could not serve for four weeks were automatically excluded from the pool. After the jury pool had been selected, but before any jury had been impaneled, the court, on 2 May 1989, ordered that the three groups of cases be consolidated for

---

**2.** The widow and personal representative of the estate of Francis L. Cadogan were among the plaintiffs in the ironworkers group. The sole active appellee in this appeal, Fibreboard Corporation, was not a defendant in the suit brought for Cadogan's death.

trial before a single judge and jury. The jurors, however, were not informed that the previous estimate of a four week trial had been based upon the assumption that the cases would be tried separately. The jury selection was completed and the jury was sworn on 3 May 1989. Presentation of evidence began on 9 May 1989.

On 15 May 1989, while the trial was underway, the court ordered a bifurcation of the trial, limiting the first stage to the issues of whether appellants' decedents had developed an asbestos-related disease and, if so, whether the disease resulted from exposure to the defendants' products. The proposed second stage of the trial would involve the issues of whether the individual manufacturers were negligent and whether their products were unreasonably dangerous. Additionally, the court informed the jury that the trial would run longer than originally anticipated. The next day, the court informed the parties that four jurors and one alternate juror had requested that they be excused from the jury after the end of May. The court noted on the record that it had received messages from those jurors and had interviewed them privately to determine the basis for their requests. The court also announced that, in order to shorten the trial and thus avoid inconvenience or hardship to the jury, the trial would be trifurcated. The first phase was then limited to all medical issues *i.e.,* whether appellants' decedents had contracted an asbestos-related disease, and compensatory damages. The second phase, before a different jury, would involve the issue of product identification; and the third phase would involve state of the art testimony and other defenses. If necessary, a fourth phase would be added to resolve the issue of punitive damages. The jurors were also informed that their service would end by the third week of June, 1989.

During the final week of the first phase of the trial, the court was informed that one of the jurors would be unable to serve beyond 23 June 1989. Consequently, the court excused that juror, and the final alternate was seated. On 23 June 1989, the jury retired for deliberations and, on 26

June, returned a verdict for the defense, having determined that none of appellants' decedents had contracted an asbestos-related disease, thereby rendering moot the remaining phases of the case.

## I

■ Appellants contend that the trial court abused its discretion in ordering the trifurcation of the trial. Specifically, they assert that the trifurcation necessitated the presentation of the same product identification witnesses in both the first and second phases of the trial, before different juries, resulting not only in inconvenience to them, but also placing upon them a double burden of proof by having to present the same witnesses before two juries. Further, appellants assert that the court erred in ruling that the witnesses who were presented during the first phase of the trial to testify concerning the presence, at various work sites, of products containing asbestos, could only so testify if they had personal knowledge of the asbestos content of those products. We perceive no error in the court's decision to separate the issues for trial, but we hold that the court erred in restricting appellants' "exposure" testimony.

## A.

Md.Rule 2–503(b) provides:

> In furtherance of convenience or to avoid prejudice, the court, on motion or on its own initiative, may order a separate trial of any claim, counterclaim, cross-claim, or third-party claim, or of any separate issue, or of any number of claims, counterclaims, cross-claims, third-party claims, or issues.

■ In *Newell v. Richards*, 83 Md.App. 371, 387, 574 A.2d 370, *cert. granted*, 321 Md. 449, 583 A.2d 249 (1990), we observed, "The decision to bifurcate a trial is within the discretion of a trial judge. Such a decision is subject to the abuse of discretion standard of review." *See also, McGarr v. Boy Scouts of America*, 74 Md.App. 127, 142, 536 A.2d

728, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988). The decision to "trifurcate" a trial, of course, involves the same exercise of judicial discretion. Thus, in determining whether the trial court abused its discretion in trifurcating the case *sub judice,* we must first determine whether the court's decision served the purpose of Rule 2–503(b) and whether appellants suffered any unfair prejudice as a result of that decision.

■ In arguing that the trifurcation of the trial did not serve the purpose of convenience, appellants assert that the separation of issues required that their product identification witnesses present similar testimony in the first and second phases of the trial. When deciding whether to separate issues for trial, however, the court must weigh the inconvenience suffered by a party against the convenience to the court, the jury, and the remaining parties, resulting from the separation of issues. The case *sub judice* illustrates well the convenience and judicial efficiency that may result from the trifurcation of a complex case. The jury's finding that none of appellants' decedents had contracted an asbestos-related disease eliminated the need for any presentation of evidence regarding the remaining issues involved in the case. We conclude, therefore, that the court's decision to trifurcate the case unquestionably served the purpose of Rule 2–503(b).

Appellants argue vociferously that the decision to trifurcate placed upon them the double burden of proving the same product identification issues, by the same witnesses, in the first and second phases of the trial, and that having to prove the same issues to two juries is unfairly prejudicial. That argument is totally illogical. Dividing the cases into separate trial phases may very well require plaintiffs to produce some of the same evidence through the same witnesses in more than one phase, but since the ultimate issues to be decided at each phase are different there can be no double burden of proving the same issues at more than one phase. In the case *sub judice,* there were no "product identification" issues to be proved at the first

phase. The jury in Phase I had to decide whether the decedents had contracted an asbestos-related disease, which required proof of exposure to asbestos. That jury was not to decide what product was a cause of the disease, which was an issue that would have been decided by a different jury had the case reached Phase II.

Beyond doubt, the bifurcation and the trifurcation of the trial while it was in progress presented appellants with some difficulties. When counsel have planned to present a case in what to them is a logical sequence designed to maximize its strong points, and have carefully worked out the logistics of scheduling key witnesses in accordance with such plans, an unexpected splintering of the case into separate trial fragments is unquestionably disconcerting and disruptive. On the other hand, the consolidation of several asbestos cases into one trial may well have created certain disadvantages for the defendants. The trial judge is in a far better position than an appellate court to determine whether the decisions to consolidate several cases and then sever issues for trial so tilts the playing field that one side or the other is denied a fair trial. Taking into consideration the sheer volume of asbestos cases, which makes consolidation of cases and severance of issues for trial a practical necessity in the handling of such cases, we are not persuaded that there was any abuse of discretion in this instance.

### B.

Combined with appellants' argument that the court erred in trifurcating the trial are contentions that the court erred in excluding certain evidence on the theory that it belonged in a subsequent phase of the trial, not in Phase I.

### (1)

■ With respect to the issue of damages, appellants contend that the court improperly denied them an opportunity to establish the "unconscionable conduct" of the defendants. We disagree. Evidence that a particular defendant

had been guilty of unconscionable conduct in knowingly putting an extremely hazardous product into the stream of commerce was not relevant or material to any issue in Phase I of the trial. Obviously, it would have no bearing on the issue of whether any of the deceased workmen had contracted an asbestos-related disease. It would be relevant to an award of damages, but to punitive damages only and not to compensatory damages. *See Exxon Corp. v. Yarema,* 69 Md.App. 124, 137, 516 A.2d 990 (1986), *cert. denied,* 309 Md. 47, 522 A.2d 392 (1987).

### (2)

■ Appellants' second assertion of error in the exclusion of evidence as a result of trifurcation relates to the refusal of the court to permit witnesses to identify by brand name the products to which the deceased workmen had been exposed.

Appellants have not referred us to any specific ruling by the trial court to that effect, and our examination of the record (which was not confined to the two volumes of record extract but included over 40 volumes of trial transcript) failed to disclose such a ruling *per se.* It is apparent from the record, nevertheless, that the court did restrict the testimony of witnesses for appellants to prohibit any mention of products by brand name, perhaps by a ruling off the record or *in camera.* At various times during the trial, counsel for appellants protested that the prohibition against evidence of brand names of products in Phase I of the trial was preventing them from proving the extent of the exposure of the decedents to asbestos, which was essential to their cases. Indeed, at one point during the trial, appellants suggested that their problem could be solved by a jury instruction to the effect that if the jury found one of the asbestos disease processes referred to by appellants' medical experts, it could take as granted that there was sufficient exposure to asbestos to have caused the disease. The court rejected that suggestion because unless there was some testimony about the decedents' exposure to asbestos,

*"without reference to specific product identification,"* the jury "will not know whether or not there was asbestos exposure which caused the disease process to which you made reference." (Emphasis added.) Later in the trial, the court instructed the jury, with respect to testimony from one of the plaintiffs' witnesses:

> —you may have noticed that there was not any reference to any specific product or company name given by that witness during any of his testimony. That is being done on purpose and it's through my instruction that he's not referring to any specific product, since product identification is not one of the issues that will be submitted to you for determination in the part of the case that you as jurors are going to deliberate and judge about.[3]

The full effect of the limitation on appellants' cases was not immediately apparent to their counsel. It was not until later, when witnesses called to testify about the dust-producing materials being used by workmen in the places in which the decedents worked from time to time were not permitted to mention the word "asbestos" unless they had personal knowledge that the materials in question actually contained asbestos, that recognition of the problem surfaced. Accordingly, at a later stage in the trial, counsel for appellants attempted to recall two witnesses who could testify to the trade names of the dust-producing materials at two principal job sites—Sinai Hospital and a Sparrows Point shipyard—at which decedents had worked for substantial periods of time. Appellants were then prepared to prove through other evidence, admissions in answers to interrogatories, that those materials contained asbestos. The court denied appellants' requests to recall the witnesses for that purpose "at this phase of the trial."

---

**3.** The witness in question was called on behalf of the widow and personal representative of the estate of Francis L. Cadogan, who are not participating in this appeal. *See* n. 2, *supra.* We quote the instruction concerning that witness as an indication of the court's preclusion of what it referred to as product identification evidence.

Concluding that the "product identification" evidence sought to be introduced by appellants was relevant, material, and of great importance to appellants' cases, we hold that the court erred in excluding it on the ground that such evidence belonged only in Phase II of the trifurcated trial proceedings. We explain.

In order to recover, the plaintiffs had to prove to the satisfaction of the jury that the deceased workmen had contracted asbestos-related diseases as a result of substantial exposure to asbestos products made or put into the stream of commerce by the defendants. Plaintiffs/appellants presented medical expert testimony to the effect that each of the deceased workmen died of cancer that was caused by asbestos. That opinion testimony was largely dependent on the experts' assumptions (based on information furnished to them) that the decedents had been employed in occupations that involved substantial exposure to asbestos, since the likelihood of contracting an asbestos-related disease is dependent upon and in proportion to the amount of exposure to asbestos.

Proof of substantial exposure of the decedents to asbestos was, of necessity, a step-by-step process. Witnesses placed decedents at specific jobsites, either working directly with or in close proximity to those working directly with material that produced considerable quantities of dust which permeated the air and settled on the deceased workmen. Some witnesses had seen the word "asbestos" on containers or otherwise had personal knowledge that at certain jobsites, on some occasions, at least, the dust-producing materials contained asbestos. Other witnesses were prepared to testify that although they had no personal knowledge as to the nature of the dust-producing materials they did know the brand names or trade names of the materials. Plaintiffs/appellants could then establish through answers to interrogatories that those named products contained asbestos.

Before the trial was trifurcated, there would have been no question about allowing witnesses to mention the names

of dust-producing products they saw being used on the jobsites. After trifurcating the trial, however, the court developed an *idée fixe* about the severed issues: "product identification" was a Phase II issue; therefore, evidence as to the identification of products by brand name simply did not belong in Phase I. That conclusion was erroneous.

Evidence, to be admissible, must be both relevant and material. Evidence is material if it tends to establish a proposition that has legal significance to the litigation; it is relevant if it is sufficiently probative of a proposition that, if established, would have legal significance to the litigation. *Paige v. Manuzak*, 57 Md.App. 621, 632, 471 A.2d 758 *cert. denied*, 300 Md. 154, 476 A.2d 722 (1984). Evidence is relevant, therefore, if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence, and a fact is material if it is of legal consequence to the determination of the issues in the case, which are dependent upon the pleadings and the substantive law. *See* McLain, *Maryland Evidence*, 5 401.1. By any standards, the "product identification" evidence that appellants were not permitted to introduce, *i.e.*, the brand names of dust-producing products used at the jobsites where appellants' decedents worked, was relevant and material. It is pellucid that exposure of the deceased workmen to asbestos was a material fact, and the excluded evidence, together with other proffered evidence, would certainly have tended to make that fact more probable than it was without the evidence.

The general rule in this State is that all evidence that is relevant to a material issue is admissible except as otherwise provided by statutes or by rules applicable in Maryland courts. McLain, *Maryland Evidence*, 5 402.1. Relevant evidence may be excluded if the trial court, in its discretion, believes that its probative value is substantially outweighed by the dangers of unfair prejudice. *See Cross v. State*, 282 Md. 468, 474, 386 A.2d 757 (1978); *Exxon Corp. v. Yarema, supra*, 69 Md.App. at 170–72, 516 A.2d

990. In the case *sub judice,* the probative value of the excluded evidence to the plaintiffs' cases is obvious; it would clearly tend to prove a fact essential to recovery. The importance of the excluded evidence to the plaintiffs' cases was demonstrated by the closing arguments of defense counsel, which placed great emphasis on the paucity of evidence of substantial exposure to asbestos. On the other hand, we can see absolutely no prejudice, much less unfair prejudice, to the defendants in admitting the evidence, since the jury hearing Phase I was not going to decide liability on the part of any defendant that made or put into the stream of commerce any particular product identified by plaintiffs' witnesses.

We hold, therefore, that it was error for the court to exclude the "product identification" evidence on the ground that it did not belong in Phase I of the trial. And since admission of the evidence would have produced no discernible prejudice to the defendants that would counterbalance its probative value, it would have been improper to exclude this relevant evidence as an exercise of discretion.

## II

Appellants contend that the court erred in striking out certain opinion testimony of their medical expert on the ground that it was not shown to be accepted by the medical community. Specifically, they assert that Dr. Gerrit Schepers should have been permitted to state his opinion as to how asbestos fibers cause cancer even though he could not state that the theory he espoused was generally accepted by the medical community. We agree.

Dr. Schepers testified that in his opinion, based upon reasonable medical probability, each of the decedents suffered from cancer caused by asbestos. In view of the fact that the defendants were asserting that cigarette smoking, rather than asbestos, was the probable cause of the lung cancers from which decedents Fulton, Nelson, Poore, Brush, and Cullum suffered, Dr. Schepers testified in some

detail how he could determine whether various cancer cells were more likely to have resulted from asbestos than from smoking. Subsequently, during the course of his testimony he advanced an explanation of the mechanism or process by which asbestos is a direct cause of cancer. Briefly summarized, his opinion, based on the fact that asbestos fibers are electrically charged, is that if one of those fibers pierces an epithelial cell and chances to strike, and by virtue of the electrical charge, to damage, destroy or alter the TB53 gene in chromosome 17, the cell becomes cancerous and replicates itself as an abnormal cell that is an enemy to the body. When he first explained that theory, which was thereafter referred to by defense counsel as the electrical charge or cattle prod theory,[4] the testimony came in without objection. During cross-examination of the witness, however, the following dialogue ensued:

[COUNSEL FOR APPELLEE]: Okay. When you were telling the jury how asbestos causes cancer, were you giving your personal opinion, Doctor, or were you giving the consensus of the medical community?

[DR. SCHEPERS]: You mean the theory of how the fiber gets into the cells?

[COUNSEL FOR APPELLEE]: Yes.

[DR. SCHEPERS]: No, that was my opinion.

Subsequently, defense counsel moved to strike the doctor's testimony regarding the electrical charge theory on the basis that the theory was the doctor's personal opinion and not a theory that was generally accepted in the medical community. Further, throughout the course of Dr. Schepers's testimony, the defendants objected to the admission of his opinions that did not reflect the general consensus of the medical community. The court sustained many of those objections and permitted the opinions to be admitted only after the doctor could demonstrate that the opinions satisfied the standard advanced by appellee. Appellants assert-

---

**4.** At one point Dr. Schepers likened the asbestos fiber to a cattle prod with respect to its electrical charge.

ed that the appropriate standard for the admissibility of the doctor's opinions was "reasonable medical probability" regardless of whether the opinions were generally accepted by the medical community. The court, however, accepted defense counsel's argument, as is apparent from the following discussion between the court and counsel:

> THE COURT: Mr. Lilly [Counsel for appellants], how can [Dr. Schepers] testify with reasonable medical certainty as to A, B, C, or D, unless he knows what is generally accepted within the medical community?

> [COUNSEL FOR APPELLANTS]: Well, there's going to be minority and majority agreement in every area, Your honor, and it's his opinion as to the diagnosis. We've been through this before. It is not the general medical community, it's his decision. Cases that have gone to the court basically were all new cases where new theories were coming into play, such as the breathalyzer or fingerprints, things like that, where you have to prove that the medical community has accepted them, but here it's his diagnosis, his opinion, that's all we need.

> THE COURT: Mr. Lilly, he has to be able to say within a reasonable medical certainty. That's the definition of reasonable medical certainty. It's what is accepted within the medical community. He didn't just read. Otherwise, you would never have to qualify his opinions with that phrase.

> [COUNSEL FOR APPELLANTS]: He asked the basis for his opinion on direct, Your Honor, and he stated that he based his opinion on his examination, on the medical and scientific articles, and he said the articles that he considered were authoritative and supported his position.

> THE COURT: But now he says he doesn't know what other doctors think; he only knows what he thinks. He says he's only testifying as to what he thinks, not what anybody else thinks.

The standard for the admissibility of medical expert opinion testimony is reasonable medical probability. *Andrews v. Andrews*, 242 Md. 143, 152, 218 A.2d 194 (1966). *See also Baughman Contracting Co. v. Mellott*, 216 Md. 278, 283, 139 A.2d 852 (1958); *Coastal Tank Lines, Inc. v. Canoles*, 207 Md. 37, 45, 113 A.2d 82 (1955). The "generally accepted in the medical community" standard that was erroneously employed by the court in the case *sub judice* was adopted in Maryland in *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978), and generally applies to the admissibility of evidence based upon novel scientific techniques or methodologies. *Id.*, at 383, 391 A.2d 364. In that respect, it is perfectly logical and reasonable to insist that prior to the introduction of expert testimony on the validity of a new scientific technique (*i.e.*, lie detector tests, breathalyzer tests, paraffin tests), it must first be established that the scientific technique has been generally accepted by the relevant scientific community as reliable.

That exposure to asbestos may cause cancer, however, is not a novel or controversial assertion, nor is it a conclusion personal to Dr. Schepers. The testimony that appellants sought to introduce was Dr. Schepers's opinion as to *how* asbestos causes cancer. Such testimony was based upon Dr. Schepers's personal observations and professional experience, and thus required only a reasonable degree of medical probability. *See, e.g., Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 915 (5th Cir.1987), *cert. denied*, 485 U.S. 1009, 108 S.Ct. 1476, 99 L.Ed.2d 705 (1988) ("An expert's opinion need not be generally accepted in the scientific community before it can be sufficiently reliable and probative to support a jury finding."); *Ferebee v. Chevron Chemical Corp.*, 736 F.2d 1529, 1535–36 (D.C.Cir.) *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984) (distinguishing the holding in *Reed v. State, supra,* as limited to evidence based upon novel scientific techniques). The holding in *Reed v. State* has not been extended to medical opinion evidence which is not "presented as a scientific test the results of which were controlled by inexorable, physical

laws." *See State v. Allewalt,* 308 Md. 89, 98, 517 A.2d 741 (1986). We do not believe it was properly applied to Dr. Schepers's medical opinion evidence in this case.[5]

Appellee contends that the court correctly struck Dr. Schepers's electrical charge theory because it was the doctor's personal opinion and that its admission would have permitted the jury to engage in speculation. Responding to a question on cross-examination, as to whether the theory was his personal opinion or the consensus of the medical community, Dr. Schepers replied, "No, that was my opinion." Since the question limited the witness's choice of responses to characterizing the theory as his personal opinion or that of the medical community, we do not construe the response as an acknowledgment that the electrical charge theory was merely *his* personal opinion. Earlier testimony by Dr. Schepers indicated that he was not the innovator of the electrical charge theory but he accepted it as being more logical than other causation theories that had been advanced. We take his response, "No, that was my opinion," therefore, as indicating that the theory he espoused did not represent a consensus of the medical community. Moreover, admission of the opinion would not have required the jury to speculate because the jury was not charged with determining *how* asbestos causes cancer, only with *whether* the decedents' cancer was the result of asbestos exposure. The jury merely had to assess Dr. Schepers's credibility in weighing his opinion that all of the decedents had suffered from an asbestos-related disease. Since the appropriate standard is reasonable medical probability, Dr. Schepers's professional opinion would be admissible even if

---

5. In *Sabatier v. State Farm Mutual Automobile Insurance Co.,* 323 Md. 232, 592 A.2d 1098 (1991), Chief Judge Murphy noted (at 249, 592 A.2d at 1106) that when the Court adopted the *Frye* evidentiary standard in *Reed,* it also adopted the view that *Frye* was deliberately intended to interpose a substantial obstacle to the unrestrained admission of evidence in *criminal* cases based on new scientific principles. (Emphasis added.)

the majority of his professional colleagues disagreed with it.

In holding that the trial court erred in requiring that Dr. Schepers's opinions satisfy an improper standard before admitting them into evidence, we are cognizant that "the admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal." *Radman v. Harold*, 279 Md. 167, 173, 367 A.2d 472 (1977); *Potomac Electric v. Smith*, 79 Md.App. 591, 644–45, 558 A.2d 768, *cert. denied*, 317 Md. 393, 564 A.2d 407 (1989). We do not, however, base our decision to reverse the judgment upon a conclusion that the trial court abused its discretion. On the contrary, the record discloses that the trial court failed to exercise its discretion and proceeded, as did the trial court in *Radman, supra*, upon a misconception of the applicable legal standard. 279 Md. at 176, 367 A.2d 472.

Although some of Dr. Schepers's opinions were shown to have been accepted by the medical community, appellants were nevertheless prejudiced by the court's use of the higher standard. The court's instruction to the jury to disregard Dr. Schepers's testimony regarding the electrical charge theory and its ruling requiring that his opinions were admissible only to the extent that they were shown to have been accepted by the medical community may very well have had a negative impact on his credibility in the eyes of the jury. We hold, therefore, that the trial court erred in striking out the doctor's testimony as to how asbestos directly causes cancer and that appellants were thereby prejudiced.

### III

Our conclusion that the trial court committed errors in excluding relevant and material evidence and in striking out competent opinion evidence requires us to reverse the judgment and remand for a new trial or trials. It is not necessary for us to address the second issue raised by

appellants, and we do not choose to do so. We believe our discussion of the court's discretion with respect to trifurcation adequately covers appellants' fourth (Due Process) contention, which was based on the decision to trifurcate the trial.

PROCEEDINGS IN THIS COURT WITH RESPECT TO APPELLEE THE CELOTEX CORPORATION STAYED PENDING FURTHER ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA. JUDGMENT REVERSED AS TO APPELLEE FIBREBOARD CORPORATION AND CASES REMANDED FOR NEW TRIAL OR TRIALS.

COSTS TO BE PAID BY APPELLEE FIBREBOARD CORPORATION.