THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAVELLE L. DAVIS, Defendant-Appellant.

Second District    No. 2—97—0725

Opinion filed May 12, 1999.—Rehearing denied June 10, 1999.

428

G. Joseph Weller and Kim D. Campbell, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of St. Charles (Martin P. Moltz and Joan M. Kripke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE RAPP delivered the opinion of the court:

Following a jury trial, defendant, Lavelle Davis, was convicted by a jury of first-degree murder while attempting to commit an armed robbery (720 ILCS 5/9—1(a)(3) (West 1992)), attempted armed robbery (720 ILCS 5/8—4, 18—2(a) (West 1992)), and armed violence (720 ILCS 5/33A—2 (West 1992)). He was sentenced to 45 years' imprisonment for the murder conviction and 10 years each for the attempted armed robbery and armed violence convictions, to be served concurrently. In the instant appeal, defendant argues that (1) the trial court erred in admitting expert testimony regarding lip print identification without holding a hearing under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); (2) the evidence was insufficient to prove he was guilty beyond a reasonable doubt; (3) his trial counsel was ineffective; and (4) that the trial court erred by convicting and sentencing him for attempted armed robbery and armed violence because of the "one-act-one-crime" rule.

## FACTS

On December 18, 1993, Patrick "Pall Mall" Furgeson (Pall Mall) was shot and killed at the Burnham Mill (the Mill) apartment complex in Elgin. According to the forensic pathologist who performed the autopsy, Dr. Joseph Cogan, Pall Mall died as a result of a gunshot wound to the abdomen from a 12-gauge shotgun fired at close range. Dr. Cogan also noted that the victim had an injury to the back of the head caused by some type of blunt-force trauma. A spent shotgun wad[1] and approximately 20 shotgun pellets were found inside the victim's body. Jack Welty, assistant lab director of the Illinois State Police forensic science lab in Rockford and an expert in the area of firearms identification, testified that the spent shell and wad fired were consistent with the shotgun found at the scene.

On January 25, 1994, defendant was charged by indictment with attempted armed robbery (720 ILCS 5/8—4, 18—2(a) (West 1992)), murder in the first degree (while attempting to commit an armed robbery) (720 ILCS 5/9—1(a)(3) (West 1992)), and an alternative count of murder in the first degree (strong probability of death) (720 ILCS 5/9—1(a)(2) (West 1992)). A subsequent amended indictment charged defendant with an additional count of armed violence (720 ILCS 5/33A—2 (West 1992)). Codefendants Raymond Mims (Raymond) and Kari Brown, otherwise known as Major Julius Hill (Major), were tried in separate proceedings.

---

[1]The shotgun wad is the portion of the shell that separates the pellets from the gunpowder. The wad is lighter than the pellets in the shell and, when the shell is fired, generally travels less distance than pellets.

Defendant's first trial was in October 1996. Sharlet Clements testified as part of the State's case in chief. Clements had given a taped statement to police on the night of the shooting that identified defendant as the shooter. On the stand, however, Clements could not remember the night in question or whether her statement was accurate. During a break in Clements' testimony, a friend of Clements approached the State's Attorney and informed her that Clements now wanted to tell the truth, that defendant was the shooter. Defense counsel's motion for a mistrial was granted.

During defendant's second trial, Sabrina Roberts testified that at 5:22 p.m. on December 18, 1993, she heard a loud noise and a girl scream outside her apartment. She went outside and saw a man lying on the ground bleeding from a hole in his stomach; two children and a woman, who Roberts later learned was Clements, were standing nearby. Roberts did not see who shot the man, but she did notice a sawed-off shotgun in the bushes.

Pall Mall's son, 11-year-old Jerrial Tharpes, testified that he and his sister, Jakira, were with their father at the Mill the day Pall Mall died. At the time, Jerrial was eight years old and Jakira was four years old. Jerrial testified that he and Jakira stayed in the car while Pall Mall went to an apartment in the Mill. Jerrial testified that he saw two men meet his father by an apartment; one man wore a light blue and light gray "Dukes" coat and the other man wore a black and gray Raiders coat. One of the men was carrying a gun, but he did not see the men's faces. Jerrial testified that the "man with the Dukes coat shot [Pall Mall] and the man with the Raiders coat choked him." The men ran away after the shooting, and the children went to their father.

Jerrial's previous inconsistent statements and testimony were elicited on cross-examination. He admitted that he previously lied to the police when he said that he could identify the men and when he told a police officer and the assistant State's Attorney that Raymond shot his father. At defendant's first trial, Jerrial testified that the man with the Duke coat choked his father and the man with the Raiders coat shot his father.

Clements testified in the second trial that in December 1993 she was pregnant and resided in the Mill with her boyfriend, Raymond. She knew defendant only as one of Raymond's friends. Clements testified that on the night before the incident she overheard Raymond tell defendant that Pall Mall had a lot of money and drugs. She also overheard defendant state that he needed money for a car.

Clements further testified that on December 18, 1993, Raymond, Major, and defendant were at her apartment. Corey Bowen came over

briefly to give Raymond the keys to his car, a brown Chevrolet. Later that day, Raymond told Clements he was going to use a pay phone, and the three men left her apartment. Just prior to leaving, the three men changed clothes. According to Clements, when they left the apartment Raymond was wearing black jeans, a blue or black "hoodie," and a black coat that could have been a Raider's coat; defendant was wearing black pants, a blue and white Georgetown Hoyas coat with a tear in the right sleeve, and a black hoodie or black shirt; and Major had changed into black pants and a hoodie.

Shortly thereafter, Clements saw Corey's car pull into the parking lot with the three men inside; it continued running with the lights off. A few minutes later, Pall Mall came to her apartment and asked for Major, stating that he received a page. When she responded that Major wasn't there, Pall Mall left her doorway. She followed Pall Mall around the corner of her apartment and saw him stop close to some bushes where Raymond and defendant met him. Although both men wore masks, Clements recognized them due to their clothing. Clements heard defendant tell Pall Mall that it was a "stick-up" and hit Pall Mall in the back of the head with a shotgun. She also saw Raymond choke Pall Mall from behind as Pall Mall wrestled and struggled. She saw the shotgun go off when defendant was pointing the gun at Pall Mall's stomach.

Defendant dropped the shotgun after it fired, and he and Raymond ran to the brown car with Major behind the wheel. Clements followed them, and defendant pushed her out of the way, telling her that she hadn't seen or heard anything. As they tried to leave the parking lot in the car, they were blocked by another car simultaneously entering the parking lot. Major blew the horn and yelled at the driver, and the other car moved to the side.

That night, Clements originally told police that she did not see anything. She later gave a taped statement at the police station, consistent with her testimony at defendant's second trial. At Raymond's trial, however, she testified that she did not see the shooting, and, at defendant's first trial, she could not remember what happened after Pall Mall came to her door. Clements admitted that she was "too scared" to tell the truth previously because Raymond abused her prior to the shooting and threatened to kill her if she told anyone. She admitted that Raymond never threatened her about her testimony; yet, Raymond frequently contacted her from jail and told her that she did not have to testify.

Clements testified at Raymond's trial and at Major's trial that because she was pregnant police officers intimidated and pressured her into making the taped statement. When Clements gave her taped

statement that defendant was the shooter, she was at the police station for six to eight hours. She testified that, when police officers told her that she could go home if she told them what they wanted to hear, she made the statement. However, Clements admitted that the police did not tell her what to say.

Clements also identified a roll of duct tape found at the scene as the same roll that she saw in her house earlier that day. She testified that Raymond had the tape and she never saw defendant with the tape. She also identified a pair of gloves found at the scene and testified that she "believed" they belonged to defendant.

Marsha Williams testified that on the day after the shooting she accompanied Clements to a house in Chicago belonging to a relative of defendant. Defendant was present and talked about the events of the night before. According to Williams, defendant admitted that he and Raymond attempted to rob Pall Mall and the gun defendant was holding discharged after a struggle with Pall Mall.

On two different occasions, Williams told police that the last time she saw defendant was the night before the shooting. Williams testified that she told this to the police because she "didn't want to get involved in the murder." On cross-examination, Williams admitted that she changed her story and agreed to testify in exchange for a deal on a pending unrelated felony charge. Her sentence was deferred until after she testified in this case.

Sherri Dorsett testified that she saw Major, Raymond, and a third man, whom she did not recognize, at the Mill around 2 p.m. on the day of the shooting. She saw the men for only a short period of time, but in the courtroom she identified defendant as the third man. Sherri did not give a statement in this case until January 1996, more than three years after the shooting.

Another resident of the Mill, Deborah Anderson, was driving home between 5:20 and 5:30 p.m. on December 18, 1993. She testified that she could not enter her parking lot because there was a mid-sized tan or cream-colored older model car blocking the entrance. She saw a black male in dark clothes get into the passenger side of the car and two other people already in the car that appeared to be black males. She did not see anyone chasing the black male who jumped into the passenger side, nor did she see the faces of the black men. Her car blocked the other car from leaving. As she moved her car to allow the other car to pass, the other car left very rapidly. It was elicited on cross-examination that she previously testified that she saw only the race of the person running and that the car was tan colored, not cream.

Another Mill resident, Roger Renard, testified that as he was taking his garbage out to the Dumpster between 5:15 and 5:20 p.m. on

December 18, 1993, he heard a gunshot and saw two men jogging toward a light brown car. According to Renard, both men were wearing Chicago Bulls jackets. On the passenger side of the car, he also saw one of the men push a little boy out of the way. Then he testified that he saw the car pull out and almost run into Anderson as she was on her way into the parking lot.

Elgin police officer Michael Gough testified that he arrived at the Mill at 6:45 p.m. on December 18, 1993, in order to gather evidence. He found a shotgun leaning in a bush with the stock sawed off and one spent 12-gauge shotgun shell in the magazine. Around the side of the building, he also found a pair of black nylon hose, a pair of work gloves, and a roll of duct tape. Because the ground was wet but the items were dry, Gough concluded that the items were recently placed there.

Leanne Gray, an Illinois State Police lab forensic scientist specializing in latent print examination, testified as an expert in impression evidence after defendant's counsel questioned her outside the presence of the jury. Gray found an upper and lower lip print on the first six to eight inches of the duct tape's sticky side. She photographed the impression to preserve it. She testified that lip prints, like fingerprints and other impression evidence, are unique and can be used to positively identify someone.

On October 18, 1994, Gray took standards of defendant's lips, using the sticky side of duct tape and lipstick on paper. She performed a side-by-side comparison of the standards and the photograph for about a month and a half, focusing on the lower part of the lower lip, and could not determine whether defendant made the impression found on the tape.

Gray mailed the photograph and standards to Steven McKasson of the Southern Illinois forensic science lab in Carbondale, Illinois. On January 3, 1995, she traveled to Carbondale, where she conducted additional comparisons with McKasson and concluded that the lip print was made by defendant.

McKasson, a document examiner for the Illinois State Police, was qualified as an expert after testifying in *voir dire* outside the presence of the jury. He testified that lip prints are unique and that lip print comparison is an accepted form of identification.

After comparing the lip prints, McKasson found at least 13 points of similarity between a standard and the photograph. He admitted that part of the latent print on the duct tape was not suitable for comparison. McKasson concluded that the person who gave the standards left the duct tape print.

Robin Sanders testified on behalf of defendant that on December

18, 1993, she was home wrapping gifts. Defendant and a friend, Fred Ellis, came to her house about 3 p.m. They all went to the mall together, arriving at 4:13 p.m. and returning home after 8 p.m. She testified that defendant never left her for any extended period of time at the mall and spent the night at her home. After defendant was arrested, she did not tell the police that defendant was with her because she believed the police would not listen to her.

On January 23, 1997, two Elgin police detectives, Lieutenant James Lamkin and Sergeant James Barnes, went to Sanders' house to speak with her. She testified that the police represented themselves as being sent by defendant. She invited them in but soon received an emergency phone call from her mother and asked the detectives to leave because she was required elsewhere immediately.

On cross-examination, she admitted that after the police left, she called defendant's attorney. She also admitted that she didn't leave her house for over 1 hour and 15 minutes after she asked the police to leave. She attributed the delay to waiting for a ride, although two cars were at her disposal. She also stated that she didn't know Fred Ellis's address and that the police didn't ask her how they could contact him.

In rebuttal, the State called Lieutenant Lamkin and Sergeant Barnes. They testified that they went to Sanders' home, identified themselves as police officers, and told her that they were investigating the December 18 murder and they wanted to speak with her because she was on the witness list provided by defendant. Lamkin testified that she appeared evasive to their questions and was having difficulty answering questions. They both testified that she was unsure about the date and she didn't mention the mall, but she did say she was home wrapping presents. After Sanders received a phone call, she said that she was needed elsewhere immediately because of an emergency and that it was impossible for her to spare a couple of minutes. She also stated that she did not know how to contact Fred Ellis.

After they left the house, the detectives drove down the street and parked about a block and a half away. They were in a vantage point to watch Sanders' house and did not see her leave. After approximately 40 minutes, Barnes called her house and Sanders was still at home.

After over six hours of deliberations, the jury found defendant guilty of first-degree murder while attempting to commit an armed robbery, armed violence, and attempted armed robbery. The trial court denied defendant's posttrial motions and sentenced defendant to 45 years' imprisonment for the murder and concurrent 10-year sentences for the armed violence and attempted armed robbery.

# DISCUSSION

## 1. Lip prints

Defendant's first point of error alleges that the trial court erred in admitting the lip print evidence and the testimony of the State's experts, Gray and McKasson. Defendant contends that the trial court was required to conduct a *Frye* hearing before admitting the lip print identification because it is novel scientific evidence. Alternatively, defendant argues that the lip print evidence was improperly admitted because the evidence was not reliable. The determination whether to admit expert testimony concerning a new scientific technique is within the discretion of the trial court. *People v. Eyler*, 133 Ill. 2d 173, 211-12 (1989).

■ Defendant argues that lip print evidence is novel scientific evidence and, thus, the court must conduct a *Frye* hearing before the evidence is admissible. Defendant is correct in stating that Illinois follows the standard outlined in *Frye* when evaluating the admissibility of a new scientific technique. *Eyler*, 133 Ill. 2d at 211. *Frye* stated:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deductions is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014.

In other words, evidence is admissible when the scientific principle on which it rests has gained general acceptance in the relevant scientific community. *People v. Miller*, 173 Ill. 2d 167, 187-88 (1996). A *Frye* hearing, therefore, would determine whether the scientific principle on which lip print comparison rests has gained general acceptance in the forensic science community. The burden is on the State to prove that the *Frye* test has been met. See *People v. Lipscomb*, 215 Ill. App. 3d 413, 430 (1991).

■ In the present case, while the court did not specifically declare a hearing pursuant to *Frye*, the attorneys questioned the State's witnesses outside the presence of the jury during *voir dire*. The State's first witness was Leanne Gray, who has worked as a forensic scientist with the Illinois State Police for 10 years. Gray specializes in latent print analysis, a type of impression evidence, which includes fingerprints, shoe prints, and lip prints. Although this was the first time she was asked to conduct a lip print comparison, she completed

over 100,000 latent print examinations, has been qualified as an expert in the area of fingerprint or impression evidence over 35 times, and she has given talks and in-house training on latent print evidence.

Gray testified that lip print comparison is not a new form of identification but it is seldom used because lip prints are not readily available. Although this print is the only case of which she is aware in Illinois in the past 10 years, the methodology of lip print comparison is very similar to fingerprint comparison. She testified that lip print comparison is a known and accepted form of scientific comparison. The methods used in her comparisons are accepted within the forensic science community, regardless of whether the comparison is a lip print or fingerprint. She opined, in accord with the Federal Bureau of Investigation (FBI) and Illinois State Police, that lip prints, like fingerprints, are unique and a positive means of identification.

The State's other witness was Stephen McKasson, a document examiner and training coordinator for the Illinois State Police. He has been employed in the area of forensic science for 25 years, 18 of those years with the Illinois State Police. For the first seven years, he worked for the United States Postal Inspection Service, where he performed thousands of fingerprint examinations each year. For the Illinois State Police, McKasson's speciality is document examination, an area in which he has testified as an expert over 125 times. McKasson previously compared lip prints in other cases.

According to McKasson, the basis for identification of impression evidence is that everything is unique if looked at in sufficient detail, and if two things are sufficiently similar, they must have come from the same source. He testified that lip print comparison is an accepted method of scientific identification in the forensic science community because it appears in the field literature. He is unaware of any dissent in the field regarding the methodology used to make a positive identification of a lip print.

After each witness testified, the court held that the State met its burden to qualify the witnesses as experts. The court stated that it understood that this is a "unique comparison," in that lip prints have not gone into evidence "too often" in the history of the court system. Nonetheless, the court found that the witnesses were qualified as experts based on the scientific procedures followed and the witnesses' experience.

The question of the admissibility of lip print identification is a matter of first impression in Illinois. Thus, because lip print identification is novel scientific evidence and has yet to be accepted in a court proceeding, the trial court was required to hold a *Frye* hearing. A *Frye* hearing determines the admissibility of novel scientific evidence based

on whether the scientific principle on which it rests has gained general acceptance in the relevant scientific community. As the experts testified, the scientific principle upon which lip print identification rests is the same as fingerprints and other impression evidence, *i.e.*, that lip prints are unique and that by employing a side-by-side comparison of a known standard to a latent print, an expert will be able to positively identify whether the lips in the standard made the latent print.

The experts also testified that lip print identification was generally accepted within the forensic science community. They testified that the FBI and the Illinois State Police consider lip prints as means of positive identification, that the technique has been around since 1950, that articles have been written about the subject, and that they did not know of any dissent inside the forensic science community on their methodology or whether lip prints were positive identification. In reviewing the witnesses' uncontroverted testimony, it is apparent that the trial judge considered the necessary facts to make a *Frye* determination during the *voir dire* questioning. Moreover, we fail to see how the judge abused his discretion by admitting this expert testimony. Therefore, we hold that the trial court complied with *Frye*.

Alternatively, defendant argues that the trial court erred in admitting the lip print identification because the identification was not reliable. There are only two ways that defendant can argue that the identification was unreliable: (1) that the method used by the experts was unreliable, or (2) that the manner in which the experts employed the method was unreliable. We are not persuaded by defendant's former argument, that the method of comparison was unreliable. During *voir dire*, defendant was afforded the opportunity to cross-examine the witnesses and attack the reliability of the lip print identification method. As the experts testified, the method they employed to identify the lip print was the same as the well-accepted method of fingerprint identification, which is accepted as a means of positive identification by the forensic science community, the FBI, and the Illinois State Police. Consequently, without any evidence offered by defendant to the contrary, we find that the method employed to identify lip prints, a side-by-side comparison, is reliable.

Challenging the manner in which the experts employed the lip print comparison method is similarly fruitless. Performance of the scientific techniques goes to the weight of the evidence, not admissibility. *People v. Watson*, 257 Ill. App. 3d 915, 928-29 (1994). Lip print comparison involves only a side-by-side visual comparison between the standard and the latent print. The same comparison made by the experts is shown to the trier of fact, and "the testimony of the experts serves only to lend assistance to the trial court in interpreting physi-

cal evidence not within the ken of the average [juror's] knowledge" (*People v. Milone*, 43 Ill. App. 3d 385, 396 (1976)). As such, the trier of fact views the evidence firsthand and, with guidance from the expert, ultimately determines the reliability of the expert's conclusion. Therefore, we disagree with defendant because the weight that the jury gives to the evidence is a matter exclusively for the jury. *People v. Campbell*, 146 Ill. 2d 363, 384-85 (1992).

Even assuming that the court erred in not conducting a *Frye* hearing, we cannot conclude that admitting the lip print identification was so prejudicial to defendant as to warrant a reversal. The prosecution offered the lip print identification into evidence to establish that defendant was at the scene of the shooting and to refute the testimony of defendant's alibi witness. The evidence technician for the Elgin police department testified that the duct tape was dry but the ground was wet, leading a trier of fact to infer that the duct tape was placed on the grass recently. Yet there was no evidence that established when the lip print was left on the tape. It is possible that the lip print was made weeks before the shooting and the shooter was coincidentally carrying the same roll of duct tape. Nevertheless, it was for the jury to determine what weight to give this evidence.

## 2. Sufficiency of the Evidence

Defendant's next contention is that the State did not prove he was guilty beyond a reasonable doubt. He first argues that the only physical evidence to place him at the scene was the unreliable lip print identification. Because we addressed the reliability and weight of the lip print identification above, we need not discuss this argument. Secondly, defendant argues that the State did not prove his guilt beyond a reasonable doubt because it did not rebut defendant's alibi witness, Robin Sanders, and the only other evidence linking defendant to the crime was the impeached testimony of Sharlet Clements and the highly suspect testimony of Marsha Williams.

■ The standard for reviewing a defendant's challenge to the sufficiency of the evidence is well settled. As the supreme court has repeatedly stated, "it is not the function of [the reviewing] court to retry the defendant." *People v. Digirolamo*, 179 Ill. 2d 24, 43 (1997). Rather, the relevant question is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Oaks*, 169 Ill. 2d 409, 458 (1996).

Clements testified in the second trial as the only eyewitness who could identify defendant at the scene of the murder. As defense counsel elicited on cross-examination, however, Clements changed her story

several times. When first questioned by the police on the day of the shooting, she denied seeing anything. Later that night, Clements made a taped statement identifying defendant as the shooter. At both Raymond's and Major's trial, she testified under oath that she did not witness the shooting and that the taped statement was the result of police intimidation. Finally, at defendant's first trial, she testified that she could not remember the evening. After a break in her testimony, however, she recanted her previous statement and stated that she now wanted to tell the truth.

Williams similarly changed her story. She testified that the day after the shooting defendant told her his role in the crime. As defense counsel elicited on cross-examination, however, she did not testify until she received a deal with the State's Attorney's office regarding her pending felony charge. Her testimony conflicted with her earlier statement to police, made a month after the shooting, in which Williams denied any knowledge of the incident.

In addition to the credibility problems with the above witnesses, defendant emphasizes the inconsistencies regarding what the shooter was wearing. Clements testified that defendant was wearing a light blue and white Georgetown Hoyas coat with a tear in the sleeve; Jerrial testified that the shooter was wearing a light blue and light gray Duke coat; and Roger Reynard testified that the men he saw jogging to the brown car waiting in the parking lot were wearing Chicago Bulls jackets.

Defendant also argues with Clements' statement that defendant told her that she didn't see anything as he got into the car. Defendant alleges that this could not have occurred because two witnesses, Roger Reynard and Debbie Anderson, testified that when they saw the men enter the brown car in the parking lot, they did not see a woman nearby. Moreover, Sabrina Roberts testified that she was outside her apartment within two minutes of the shooting and saw Clements by the body. Defendant argues this statement is significant because he alleges that Clements, who was pregnant at the time, could not make it from the parking lot back to the body before Roberts was out of her apartment.

■ Essentially, defendant argues that the State did not satisfy its burden of proof because of the inconsistent testimony and the questionable witnesses. It is the function of the trier of fact, however, to weigh the credibility of witnesses and to resolve conflicts or inconsistencies in their testimony. *Digirolamo*, 179 Ill. 2d at 46. We will not substitute our judgment for that of the trier of fact in determining the credibility of the witnesses and the weight of the evidence. *Digirolamo*, 179 Ill. 2d at 46.

Although Clements was throughly impeached and Williams may have had an ulterior motive to testify, the jury found defendant guilty. We find that there is sufficient evidence in the record to support the jury's conclusion. Clements explained that she previously lied because she was afraid of Raymond and what would happen to her if she testified. Before the shooting, Raymond threatened to kill her if she told anyone that he abused her. She also testified that Raymond frequently suggested that she shouldn't testify. At defendant's second trial, when Clements' testimony was consistent with her taped statement, Clements was no longer associated with Raymond and no longer lived at the Mill. It is not unreasonable to infer that she was no longer afraid of Raymond because she was away from him and could now testify truthfully.

Clements' taped statement was also corroborated by the victim's autopsy. Clements testified that before defendant shot Pall Mall, defendant hit Pall Mall in the back of the head with the shotgun. Clements could not have known this without seeing the shooting because she gave the taped statement to police the night of the shooting before she had any contact with defendant, Raymond, or Major. Dr. Cogan testified that upon peeling the skin back on the victim's head, he noted a hematoma on the back of the head that was caused by some blunt-force trauma. The doctor testified that the wound was not apparent from the outside of the victim's skin. Furthermore, the jury could have easily found Sanders, defendant's alibi witness, less than credible. She testified that defendant and a friend, Fred Ellis, were with her from 3 p.m. the day of the murder until the next day. After defendant was arrested, however, Sanders never offered this significant exculpatory evidence to the police or the State's Attorney.

Sanders was also visited by police detectives who wanted to question her because she was on defendant's witness list. Sergeant Barnes testified that she was evasive and had difficulty answering questions. After a few minutes, Sanders received a phone call and explained that she was needed elsewhere immediately because of an emergency. She told the police that she didn't have enough time to answer any further questions. Yet, once she shuffled the police out of her house, instead of leaving immediately, she called defendant's attorney. In fact, she did not leave her house for over an hour. She also testified that the police didn't ask her how they could contact Fred Ellis, which conflicted with Sergeant Barnes's testimony that she stated she did not know how to contact Ellis.

■ In sum, the jury chose to believe Clements over the other in

consistent testimony and defendant's alibi witness. As the supreme court has stated:

"[T]he resolution of the [defendant's] guilt or innocence depended on the credibility of the witnesses and the weight given their testimony. It is well settled that these determinations are exclusively within the province of the jury. [Citations.] Similarly, it is for the jury to resolve any conflicts in the evidence." *People v. Collins*, 106 Ill. 2d 237, 261-62 (1985).

In other words, the jury was free to decide which testimony to believe and which testimony to discount. Therefore, after viewing all the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. Ineffective Assistance of Counsel

Defendant next argues that his attorney, private defense attorney Lee Bastianoni, deprived him of his right to effective assistance of counsel. Specifically, defendant argues that Bastianoni was ineffective because he failed to attend 10 pretrial court hearings on defendant's behalf; failed to use two letters to impeach Clements; failed to request a *Frye* hearing prior to the experts' testimony regarding the lip print testimony; and failed to object to the admission of the experts' testimony.

■ Any assertion of ineffective assistance of counsel must be evaluated under the standards of *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *Strickland* requires that the defendant show (1) counsel was deficient; and (2) this deficiency prejudiced the defendant. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *People v. McDaniel*, 164 Ill. 2d 173, 187 (1995). To establish prejudice, a defendant bears the burden of proving " 'the factfinder would have had a reasonable doubt respecting guilt' " if not for counsel's errors. *People v. Chapple*, 291 Ill. App. 3d 574, 585 (1997), quoting *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69. There is a strong presumption that counsel's performance was within the wide range of reasonable professional assistance (see *People v. Mason*, 268 Ill. App. 3d 249, 255-56 (1994)), and the evaluation of counsel's conduct does not extend to counsel's exercise of professional judgment, discretion or tactics (*People v. Franklin*, 135 Ill. 2d 78, 118-19 (1990)).

■ In the present case, defendant raised the ineffective assistance of counsel issue at trial. Defendant expressed his concern to the court that he was unsatisfied with his representation because of Bastianoni's numerous absences and the delay he was experiencing in his trial. De-

fendant later acknowledged that the problem was solved and continued with Bastianoni.

Defendant also raised the issue in a posttrial motion, which was denied by the trial court. The court acknowledged that Bastianoni "did a very competent and super job in his representation" of defendant throughout every aspect of this case. The court further stated that Bastianoni is "one of the most skillful and knowledgeable lawyers that I've had doing trials." The court opined that defendant made the motion just to stall his sentencing, not because of any ineffectiveness concerns. The court concluded that there was no conduct before it that could be considered ineffectiveness of counsel. Nevertheless, the court appointed Assistant Public Defender Shari Bertane to specifically address the ineffective assistance of counsel claim on the posttrial motion. After interviewing defendant, Bertane did not feel that defendant's claims were meritorious under the *Strickland* test.

On appeal, defendant first argues that Bastianoni was ineffective because he failed to attend numerous pretrial hearings. The record shows that Bastianoni was absent from numerous pretrial hearings because he was sick or on trial elsewhere. However, most of the pretrial hearings Bastianoni missed were merely status calls. Any hearings of substance were continued until defendant was represented by counsel. Moreover, defendant does not establish how these alleged errors prejudiced him.

Secondly, defendant argues that Bastianoni was ineffective because he did not impeach Clements with letters written by her to Raymond in which she apologized for making a statement to police and acknowledged that the statement was false. This argument is without merit. The record is clear that Bastianoni throughly impeached Clements without the letters. The trial court commended Bastianoni's impeachment of Clements and stated that Bastianoni's "art of cross examination probably is as best as I've ever seen." Thus, the jury was well aware that Clements' veracity was questionable.

Lastly, defendant argues that Bastianoni was ineffective because he failed to request a *Frye* hearing and object to the admission of the experts' testimony regarding the lip print evidence. We find that the failure of Bastianoni to specifically request a *Frye* hearing did not prejudice defendant because, in effect, such a hearing was held before each expert witness testified. During these hearings, Bastianoni adequately highlighted the lack of lip print comparison evidence, literature in the field, number of experts who endorse the theory, and the dearth of cases in Illinois in the past 10 years. Similarly, defendant was not prejudiced by Bastianoni's failure to object to the experts' testimony because Bastianoni did a very thorough job on his cross-

examination in front of the jury. Thus, defendant has not satisfied his burden of proof to establish a meritorious ineffective assistance of counsel claim.

4. "One-act-one-crime" Rule

■ Lastly, defendant argues, and the State concedes, that his convictions and sentences for attempted armed robbery and armed violence must be vacated under the "one-act-one-crime" rule expressed in *People v. King*, 66 Ill. 2d 551 (1977). Where multiple convictions arise from the same act, a sentence may be imposed only on the more serious offense. See *King*, 66 Ill. 2d at 566. Consequently, because all three convictions arose from the same act, defendant's convictions and sentences for armed violence and attempted armed robbery must be vacated. See *People v. Lillard*, 200 Ill. App. 3d 173, 181 (1990) (holding that where defendant was convicted of first-degree murder and armed violence, the armed violence conviction must be vacated as a multiple conviction arising from the same act).

## CONCLUSION

For the foregoing reasons, the convictions of armed robbery and armed violence are vacated, and the decision of the circuit court of Kane County is affirmed as modified.

Affirmed as modified.

BOWMAN, P.J., and McLAREN, J., concur.